MEDALIST FORMING SYSTEMS, INC. *v.* MALVERN
NATIONAL BANK

91-363                                    832 S.W.2d 228

Supreme Court of Arkansas
Opinion delivered June 8, 1992

*Dover & Dixon, P.A.*, by: *Monte D. Estes*, for appellant.

*Glover, Glover & Roberts*, by: *Mark Roberts*, for appellee.

DONALD L. CORBIN, Justice. Medalist Forming Systems, Inc. (Medalist) appeals an order entered in a receivership action authorizing the liquidation of certain property in possession of Concrete Curing and EPOX Products Company (CCEP), and ordering the proceeds of the liquidation applied to CCEP's debt to appellee Malvern National Bank (Bank).

The bank brought the receivership action in Hot Spring County Chancery Court after CCEP defaulted on two promis-

sory notes held by the bank that secured interests in CCEP's accounts receivable and inventory. The bank had perfected its security interests by filing financing statements with the Hot Spring County Clerk and the secretary of state. The chancellor appointed a receiver, who petitioned the court for the authority to liquidate all materials located in the CCEP factory, with the proceeds to be applied to CCEP's bank debt. The petition was subject to notification of and the right to objection by any known party claiming an interest in CCEP's factory materials. Upon receiving notification, appellant Medalist, a concrete forming business, asserted ownership to several items the receiver had designated for sale and objected to the proposed liquidation on grounds that CCEP was a mere bailee for the goods at issue.

The chancery court held a hearing on appellant's objection on August 28, 1991. Medalist presented evidence that it had reached a verbal "toll blending" agreement with CCEP in June 1991, whereby Medalist would purchase raw materials which would then be delivered to CCEP and processed by CCEP into finished products. Lindon Duncan, president of CCEP, testified that after CCEP processed the raw materials, CCEP returned the finished products to Medalist whereupon Medalist paid CCEP a processing fee. Medalist also introduced purchase orders and other documents reflecting Medalist's purchases of raw materials, and invoices to Medalist from CCEP for the reworking and processing of raw materials.

The bank presented evidence that the business dealings between Medalist and CCEP and the operational practices of CCEP consistently indicated that CCEP possessed rights in all of the inventory located at the CCEP facility. Rita Turner, an assistant vice president in charge of loan reviews at the bank, testified that she reviewed CCEP's inventory list and balance sheet in June 1991. The inventory list, introduced as "Plaintiff's Exhibit 9," includes products labeled with the "Meda" prefix associated with Medalist. Turner testified that all of the products on the inventory list, including those with the "Meda" prefix, were represented to the bank as being the inventory of CCEP. The bank also introduced CCEP invoices dated June 11, 1991, showing sales of raw materials to Medalist. Subsequent CCEP invoices, dated through July 1991, reflect CCEP deliveries of products labeled with the "Meda" prefix to various companies.

Floyd Parker, president and CEO of the bank, testified that he was informed of a possible arrangement between CCEP and Medalist during a meeting at the bank with Mr. and Mrs. Duncan. Parker testified that the meeting was primarily for the purpose of discussing the status of CCEP's inventory and accounts receivable, and that he did not recall discussion of a "toll blending agreement." Duncan sent Parker the inventory list that included the "Meda"-labeled products in response to Parker's request for documentation of CCEP's inventory.

Jeff Davis, the court-appointed receiver, testified that he conducted an inventory at the CCEP facility on August 7, 1991. According to Davis, the inventory at the CCEP facility was not segregated so as to enable an outsider walking into the facility to determine that any of the inventory belonged to a party other than CCEP. Davis testified that a CCEP employee informed him that certain materials belonged to Medalist. However, Davis included all of the materials on one inventory list because he did not see any indication that the materials did not belong to CCEP.

At the conclusion of the hearing, the chancellor entered an order subjecting all of the unsold pre-receivership inventory and the accounts receivable to the perfected security interests of the bank. The order found that CCEP and Medalist never reached a "complete ascertainable toll blending agreement," and that an inspection of the CCEP factory would have indicated to a third party that the materials being processed were the inventory of CCEP. The order further found that following the alleged agreement, CCEP continued to ship products to its customers as if the customers were purchasing from CCEP. The chancellor ruled that Ark. Code Ann. § 4-2-326 (Repl. 1991),[1] a codification

---

[1] (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

(a) A "sale on approval" if the goods are delivered primarily for use; and

(b) A "sale or return" if. the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this

of U.C.C. § 2-326, applied in this case, and that doubts as to the nature of CCEP/Medalist arrangement should be resolved in favor of the creditor bank as opposed to Medalist, the party claiming a bailment.

█ While our review of chancery cases is *de novo*, we recognize the chancellor's superior position for the purpose of weighing issues of credibility, and we do not reverse findings of fact unless the chancellor's findings are clearly erroneous. *McElroy* v. *Grisham*, 306 Ark. 4, 810 S.W.2d 933 (1991).

█ On appeal, appellant Medalist relies on two arguments. First, appellant argues that the chancellor erred in relying on section 4-2-326 because the raw material delivered to CCEP was not delivered "for sale." Second, appellant argues that CCEP acted as "bailee" for the materials at issue, and therefore, the appellee bank's security interests never attached to the materials. Both of appellant's arguments rest on a premise which the trial court specifically found not to be true — namely, the premise that CCEP and Medalist conducted business pursuant to a "toll blending agreement." We affirm because we cannot say that the chancellor's contrary finding was clearly erroneous.

The evidence presented at the liquidation hearing is sufficient to support the chancellor's finding that CCEP and appellant did not arrive at a "complete ascertainable [toll blending] agreement." The testimony and documentary evidence regarding the invoices indicated that subsequent to the parties alleged

---

subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

   (a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

   (b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

   (c) Complies with the filling provisions of the chapter on secured transactions (chapter 9 of this title).

   (4) Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this chapter (§ 4-2-201) and as contradicting the sale aspect of the contract within the provisions of this chapter on parol or extrinsic evidence (§ 4-2-202).

   (5) The provisions of this section shall not apply to the placement of works of fine art on consignment.

agreement, CCEP continued to ship the alleged Medalist products to CCEP's inventory practices, is inconsistent with an arrangement whereby Medalist retained an interest in the materials delivered to CCEP's facility.

The testimony of Juan Arriola, the Medalist comptroller, also supports the chancellor's finding that Medalist and CCEP never reached a complete agreement. When questioned as to whether Medalist had reached either a verbal or written toll blending agreement with CCEP, Arriola responded, "Your Honor, I cannot answer that with a yes or no." Upon further questioning, Arriola explained that one reason Medalist and CCEP had not signed an agreement was because Medalist could not guarantee the volume demanded by CCEP. When asked again whether Medalist had an agreement with CCEP, Arriola answered, "No."

Subsection (3) of section 4-2-326 provides:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.

Subsection (2) provides that such goods are subject to claims of the buyer's creditors while in the buyer's possession.

■ Despite appellant's contrary assertions, the afore-mentioned evidence, particularly the invoice, inventory, and shipping evidence, supports the conclusion that the raw materials delivered to CCEP by Medalist were delivered "for sale." The arrangement between CCEP and Medalist also meets the other two requirements set out in subsection (3) for deeming the goods to be on sale or return and therefore subject to the claims of the buyer's creditors. Namely, Medalist delivered and materials at issue to CCEP, a company that dealt in the same types of materials under a name other than Medalist.

■ Because the goods delivered by Medalist are deemed to be "for sale" under subsection (3), the bank should prevail regardless of whether the arrangement between CCEP and Medalist constituted a bailment. We construe subsection (3) of

section 4-2-326 so as to resolve all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer. U.C.C. § 2-326 cmt. 2; *Simmons First State Bank* v. *Wells*, 279 Ark. 204, 650 S.W.2d 236 (1983). In *Simmons*, we used this rationale to hold that an arrangement may constitute a bailment yet be considered a sale for purposes of determining superior rights in the materials at issue. "With regard to the rights of creditors, it is irrelevant whether the transaction between the two parties was a bailment or a sale if the provisions of [§ 4-2-326(3)] are also satisfied." *Id.* at 209, 650 S.W.2d at 239.

■ The concern in this case, as in *Simmons*, is the protection of the receiving party's creditors. When goods are "deemed" to be "on sale or return" under section 4-2-326(3), the only "escape" provisions relevant to this case that the delivering party may rely on to obtain priority over the receiver's creditors are parts (a) and (c) of subsection (3). These provisions allow a party in Medalist's position to gain priority over third party creditors by either evidencing its interest with a sign or filing under the provisions of Article 9. If a delivering party does not avail itself of any of the options under subsection (3), the goods at issue are subject to the claims of the receiving party's creditors. Section 4-2-326(2).

The foregoing rule is applicable even in a transaction that is not a true sale at all given that the uniqueness of section 4-2-326 is that it applies to transactions that do not fall within the everyday connotation of the word "sale." *See Simmons* at 210, 650 S.W.2d at 239. "The section's importance lies primarily in the role it plays, along with the notice provisions of article nine, in giving disclosed claims to property priority over secret claims. To encourage disclosure of in rem claims is a central feature of any well-reasoned system of commercial law." *Id.* at 210, 650 S.W.2d at 239, quoting *In Re KLP, Inc. Fin. Co. of Am.* v. *Morris*, 7 B.R. 256 (Bkrtcy. N.D. Ga. 1980). Accordingly, when such claims are not disclosed in accordance with Article 9, the delivery party does not have priority over the claims of the receiving party's creditors. *Id.* This policy of interpreting section 4-2-326 so as to resolve ambiguous arrangements in favor of disclosed creditors also accords with Professors White and Summers' interpretation of U.C.C. § 2-326:

> In our view the courts should focus upon the expectation of third party creditors who might deal with the processor. If the owner has enabled the processor to mislead these third parties by the processors' ostensible ownership, the owner should pay that price.

White and Summers, *Uniform Commercial Code* (3d ed.) § 25.5.

In this case, Medalist could have protected its interest by filing under Article 9 or by posting a sign evidencing its interest in the goods at CCEP. Its failure to take either action, however left the bank without knowledge of another claim to rights in CCEP's inventory and accounts receivable. Given that failure, the U.C.C. policy of protecting disclosed creditors dictates that the bank receive priority over a party claiming priority based on an undisclosed, private agreement with CCEP.

Accordingly, we affirm the chancellor's order in favor of appellee.

GLAZE, J., concurring, on basis the chancellor's finding is not clearly erroneous that the delivery of raw materials to CCEP was not a bailment and instead the materials were delivered so CCEP could sell them.